## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

THE UNITED STATES OF AMERICA; the
STATE OF FLORIDA; and *ex rel.*,
DEBORAH KANTOR,

        Plaintiffs and Relator,

        vs.

FAMILY HOME HEALTH SERVICES,
LLC and FAMILY HOME PHYSICIANS,
LLC,

        Defendants.

CASE NO. 3:15cv260-J-39JRK

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

### FALSE CLAIMS ACT COMPLAINT

On behalf of the United States of America ("United States" and/or the "Government"), as

well as the State of Florida, and pursuant to the *qui tam* provisions of the federal False Claims

Act, 31 U.S.C. §§ 3729-3733, Plaintiff-Relator, Deborah Kantor ("Plaintiff-Relator"), files this

*qui tam* Complaint ("Complaint") against Defendants, Family Home Health Services, LLC

("FHHS") and Family Home Physicians, LLC ("FHP") (collectively, "Defendants"), and alleges

as follows:

## I.  INTRODUCTION

1.  This case involves FHHS's illicit patient recruitment practices, false certifications

of patient need for its services, and payments of improper kickbacks to induce FHP physicians to

refer patients under Medicare for home healthcare services to FHHS. FHHS provided FHP a

number of benefits for free or at below fair market value, including the payment of account

executives to recruit Medicare patients and patients covered by other Government Healthcare

Programs (defined below) from independent living facilities for physicians employed by FHP

1



(also referred to as "medical directors"), in exchange for the physicians' referrals and federally required face-to-face ("F2F") documentation and certification of patient need for home healthcare services to be provided by FHHS.

2.      More often than not, however, the FHHS account executives would coax Medicare patients into signing up and starting home healthcare services with the promise of free treatment at the initial recruitment event, prior to the patients ever seeing or consulting a doctor to recommend and certify such services.  Instead, the Medicare patients are *first* signed up by an FHHS employee to receive services, and *then* sent to FHP for a physician to indiscriminately sign off on the services so that FHHS can seek reimbursement through Medicare.

3.      In general, the goal of Defendants is to sign as many Medicare patients up for FHHS's services as quickly as possible, regardless of patient need, in order to receive the flat, upfront fee from Medicare for home health services.  Then, Defendants would try to automatically recertify those patients (even if they did not qualify for the services) or discharge those patients as quickly as possible, given FHHS's limited capacity to adequately render the necessary services.

4.      The impropriety of the referral and certification scheme is underscored by the dubious affiliation between FHHS and FHP.  Upon information and belief, FHHS and FHP function as alter egos of each other, as an integrated enterprise and/or as a joint or single employer.  As a result, the "passing" of patient referrals effectively amounts to wholly internal self-referrals.  This belief is based upon Plaintiff-Relator's actual experience working with FHHS/FHP, in addition to the fact that FHHS and FHP share office space, support staff, infrastructure, and other marketing staff and materials.

5.      The profit-driven nature of FHHS's recruiting and certifying as many Medicare patients as possible to maximize reimbursements received from the Government unsurprisingly results in many patients receiving unnecessary or undesired home healthcare services. Meanwhile, as a result of the exclusive nature of the referral scheme between FHHS and FHP and FHHS's limited resources, some patients receive inadequate care, as detailed below.

6.      Defendants' illicit scheme was and is widespread, egregious, and orchestrated from the highest levels of the company.

7.      Plaintiff-Relator is informed and believes that the pervasive kickbacks and false claims resulting from Defendants' illegal self-referral practices began in or about 2006, if not beforehand.

8.      Had the Government been aware of Defendants' fraudulent practices alleged herein, the Government would not have accepted the fraudulent claims and paid the amounts through Medicare, Tricare, and other federally-funded government healthcare programs (hereinafter referred to as "Government Healthcare Program(s)") for these home healthcare services.

9.      Defendants' practices violate, *inter alia*, the federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), because they resulted in fraudulent and invalid requests for payment by Government Healthcare Programs for the home healthcare services.

## II.    THE PARTIES

10.     Plaintiff-Relator is a duly licensed nurse practitioner with over 15 years of healthcare experience. Plaintiff-Relator was hired to work for FHP in October 2012 as a nurse practitioner and was terminated from employment in September 2013. She currently resides in Ponte Vedra Beach, Florida.

11.     Defendant, FHHS, is a home healthcare agency with eleven (11) locations throughout the State of Florida.  FHHS operates as a Florida limited liability company with its headquarters located at 6320 Venture Drive, Suite 205, Lakewood Ranch, FL 34202.  Michele Thomas ("Thomas") is the President of FHHS.

12.     Defendant, FHP, provides ongoing physician and nurse practitioner services to patients, including but not limited to the initial consultation to certify and create a plan of care for its home health patients.  FHP operates as a Florida limited liability company with its headquarters located at 5460 63rd Street East, Suite B, Bradenton, FL 34203 (and with an official mailing address listed as the same as FHHS's offices: 6320 Venture Drive, Suite 205, Lakewood Ranch, FL 34202).  The physicians employed by FHP are all given the title of Medical Director.  Thomas, President of FHHS, is also the President of FHP.

13.     FHHS and FHP are and function as alter egos of each other, as a joint entity, as a single or joint employer and/or as an integrated enterprise.  At all pertinent times, Defendants have been legally responsible for the actionable conduct and schemes to defraud the Government detailed in this Complaint.

## III.    AGENCY ALLEGATIONS

14.     At all times relevant hereto, FHHS's other employees and officers were the agents, servants, employees, successors, assignees, transferees, and/or joint venturers of FHHS, and each was, as such, acting within the course, scope and authority of said agency, employment, and/or joint venture and was acting with the consent, permission, and authorization of FHHS.  FHHS ratified and approved all actions in furtherance of the scheme alleged in this Complaint by such agents, servants, employees, successors, assignees, transferees, and/or joint venturers.

4

15.     At all times relevant hereto, FHP's other employees and officers were the agents, servants, employees, successors, assignees, transferees, and/or joint venturers of FHP, and each was, as such, acting within the course, scope and authority of said agency, employment, and/or joint venture and was acting with the consent, permission, and authorization of FHP.  FHP ratified and approved all actions in furtherance of the scheme alleged in this Complaint by such agents, servants, employees, successors, assignees, transferees, and/or joint venturers.

**IV.     SOURCE OF PLAINTIFF-RELATOR'S ALLEGATIONS**

16.     Plaintiff-Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

17.     Plaintiff-Relator is the original source of the information upon which this Complaint is based and the facts alleged therein, as that phrase is used in the FCA and other laws at issue in this Complaint.

18.     Plaintiff-Relator brings this action based on her direct knowledge and, where indicated, on information and belief, supplemented by additional factual investigation undertaken on her behalf and at her direction.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

**V.      JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.  This Court has supplemental jurisdiction over the counts relating to the state FCAs pursuant to 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside, or transact business in this District.

Additionally, this Court has personal jurisdiction over Defendant because acts prohibited by 31 U.S.C. § 3729 occurred in this District.

21.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

22.     Prior to the filing of this Complaint, Plaintiff-Relator, through her counsel, advised the Government that she would be filing this Complaint and apprised the Government of the substance and nature of her allegations.  Plaintiff-Relator has met all jurisdictional and other prerequisites to filing suit.

## VI.     THE REGULATORY ENVIRONMENT

23.     Pursuant to the Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration, in cash or in kind, in exchange for the referral of any services (including home healthcare services) for which payment is sought from any Government Healthcare Program, including Medicare, Medicaid and Tricare.

24.     The AKA is designed to, *inter alia,* ensure that patient care will not be improperly influenced by inappropriate compensation to physicians.

25.     Every Government Healthcare Program requires every provider or supplier to ensure compliance with the provisions of the AKA and other federal laws governing the provision of healthcare services in the United States.

26.     The AKA prohibits compensating, in cash or in kind, a healthcare provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its services over the services of any competitor.

27.     A violation of the AKA is a violation of the federal FCA.  The FCA, 31 U.S.C. §

3729, provides, in pertinent part, that:

> (1) Any person who (A) knowingly presents, or causes to be
> presented, a false or fraudulent claim for payment or approval; (B)
> knowingly makes, uses, or causes to be made or used, a false
> record or statement to a false or fraudulent claim; (C) conspires to
> defraud the Government by getting a false or fraudulent claim paid
> or approved by the Government;
>
> * * *
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person.

*See also* 28 C.F.R. § 85.3(a)(9) (2010) (raising penalties from range of $5,000 to $10,000 to

range of $5,500 to $11,000 to account for inflation).

A.     The FCA And The Medicare Fraud And Abuse/Anti-Kickback Statute

28.     The FCA provides that any person who knowingly presents or causes another to

present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to

$11,000 for each such claim, plus three times the amount of the damages sustained by the

Government.  31 U.S.C. § 3729(a)(1)(A)-(B).

29.     The AKA, which also applies to state Medicaid programs and/or municipal

programs, provides penalties for individuals or entities that knowingly and willfully offer, pay,

solicit or receive remuneration to induce the referral of business reimbursable under a federal

health benefits program.  42 U.S.C. § 1320a-7b(b).  The offense is a felony punishable by fines

of up to $25,000 and imprisonment for up to five years.  *Id.*

30.     The AKA arose out of Congressional concern that payoffs to those who can

influence healthcare decisions will result in goods and services being provided that are medically

7

unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the Government Healthcare Programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization and/or poor quality of care.

31.     The Balanced Budget Act of 1997 amended the AKA to include administrative civil penalties of $50,000 for each violation, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

32.     In accordance with the AKA, applicable regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the referral of home health services paid as a result of the volume or value of any referrals or business generated. *See* 42 C.F.R. § 1001.952(f). Thus, home health agencies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order home health services that may be paid for by a Government Healthcare Program. The law not only prohibits outright bribes, but also prohibits any payment or provision of services at below fair market value by a home health agency that, as one of its purposes, induces a physician to refer an individual to the agency to furnish home health services.

33.     Such remunerations are kickbacks when paid to induce or reward physicians for making referrals for home health services. Kickbacks increase Government Healthcare Program expenses by inducing medically unnecessary overutilization of medical services and excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as physicians may

8

recommend medical services based on the physician's own financial interests rather than according to the patient's medical needs.

34.     The AKA contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protect Defendants from liability for the conduct alleged herein.

35.     Recently, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, § 6402(g), amended the AKA (a/k/a "Social Security Act"), 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the FCA.  The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation."  Public Law No. 111-148, § 6402(h).

36.     As detailed herein, FHHS devised a scheme whereby it paid kickbacks to physicians in the form of cash and cash equivalents with the specific aim of inducing referrals for FHHS's home healthcare services.

37.     Knowingly paying kickbacks to physicians to induce them to certify or refer patients for FHHS's services (or to influence physician judgment) for individuals seeking reimbursement for home health services from a Government Healthcare Program, or causing others to do so, while certifying (or causing another to certify) compliance with the AKA or billing the Government as if in compliance with these laws, violates the FCA.

**B.      Requirements for Reimbursement of Home Health Services**

38.      In order to qualify for home health benefits paid by Medicare, an individual must

be under the care of a physician and receiving the services under a plan of care established and

reviewed regularly by a doctor.  42 U.S.C. §§ 1395x(m) (defining "home health services),

1395bbb ("Conditions of Participation for Home Health Agencies; Home Health Quality"); 42

CFR § 424.22(a) ("Requirements for Home Health Services"); *see also* Medicare Benefit Policy

Manual, CMS Pub. 100-2, § 30.2.

39.      In addition, to be eligible for Medicare home health benefits, a physician or nurse

practitioner must conduct an initial assessment visit to determine and certify that an individual is

(1) homebound; (2) in need certain services, including intermittent skilled nursing care, physical

therapy, speech-language pathology services, and continued occupational therapy; (3) has a plan

of care established and reviewed periodically by a physician; and (4) under the care of a

physician when the services are furnished.  42 U.S.C. §1395f(a)(2)(C); 42 CFR §§ 424.22(a)(1),

484.55(a)(1); *see also* Medicare Benefit Policy Manual, CMS Pub. 100-2, §§ 10.1.A, 30.  The

initial assessment visit must be completed within 48 hours of a referral, or on the physician-

ordered start of care date.  42 CFR § 484.55(a)(1).

40.      For individuals that commenced home health care on and after January 1, 2011,

Section 6407 of the PPACA requires a physician to document on the certification itself (or an

addendum thereto) that he or she, or a qualifying non-physician practitioner, has conducted a

Face-to-Face ("F2F") encounter with the individual to determine that the individual's condition

requires such home health services.  42 U.S.C. § 1395m(a)(11)(B)(ii); 42 C.F.R. §

424.22(a)(1)(v).  The F2F encounter must occur within 90 days prior to the start of home

healthcare or within 30 days after the start of care.  42 C.F.R. § 424.22(a)(1)(v).  It is

10

unacceptable for a physician to verbally communicate the F2F encounter with a home health

agency, where the agency would then document the encounter as part of the certification for the

physician to sign. *See id.*

41.     The need for home health services to be provided by a home health agency may

not be certified, and a plan of care may not be established and reviewed, by a physician *who has*

*a financial relationship* with that home health agency, unless the relationship meets an

enumerated statutory exception.  42 CFR § 484.22(d) (emphasis added).

42.     A home health agency is required, prior to starting home health care, to inform

prospective patients in writing of their rights, including the right to be fully informed in advance

about the care and treatment (or any changes thereto) to be provided by the agency and the right

to be fully informed orally and in writing (in advance to coming under the care of the agency) of

what is and is not covered by Medicare and what charges the patient may be responsible for in

connection with the home healthcare services.  42 U.S.C. § 1395bbb(a)(1); *see also* 42 CFR §

484.10.

43.     Finally, the Medicare statute expressly prohibits Government payment of

expenses incurred for services that are "not reasonable and necessary for the diagnosis or

treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A); *see also* Medicare Benefit Policy

Manual, CMS Pub. 100-2, § 20.1.

## VII.     FACTUAL ALLEGATIONS

### A.     FHHS's Patient Recruitment and Referral Kickback Scheme

44.     From beginning to end, the improper relationship between and scheme

orchestrated by FHHS and FHP was composed of fraudulent representations and practices,

resulting in unnecessary and/or inadequate care for patients and costing the Government millions of dollars in paid Medicare claims.

### i.  Free Marketing Services

45.    Defendants' fraudulent cross-referral/kickback schemes begin with the improper patient recruiting practices of FHHS, which operates as free marketing service for FHP and directly generate income for FHHS and FHP in the form of Medicare reimbursements.

46.    Plaintiff-Relator was hired as a nurse practitioner by FHP in October of 2012 by Valerie Cobb ("Cobb"), the Office Manager of FHP, and Thomas, the Vice President of FHP at the time.  Plaintiff-Relator's initial employment objectives included the expansion of FHP's practice in or around Daytona Beach and Jacksonville.

47.    In furtherance of her duties, Plaintiff-Relator was immediately paired with a collaborating FHP Medical Director, Dr. Shriram Marathe, whose private practice is located in St. Augustine Beach, Florida.  As observed by Plaintiff-Relator, it is very common for an FHP Medical Director to maintain his or her own completely separate and distinct private practice. Upon information and belief, in addition to the kickbacks described below, each FHP Managing Director is paid approximately $1,000 per month to assume his/her FHP title.

48.    During her first week of employment, Plaintiff-Relator was instructed to visit Dr. Marathe's existing patients, including those that he has never visited.  Upon visiting Dr. Marathe's FHP patients, it became readily apparent to Plaintiff-Relator that her purpose was to merely certify the patients for home healthcare services billable to Government Healthcare Programs and to refer those patients directly back to FHHS to provide those healthcare services.

49.    In furtherance of the kickback scheme, Plaintiff-Relator was also instructed to work with other FHHS Account Executives ("AE(s)"), whom she was informed could introduce

her to local facilities so that she could start meeting the service coordinators and begin developing a patient base for FHP to refer back to FHHS.

50.     FHHS employs two to five AEs in each of its eleven branch offices located throughout the State of Florida. The role of an FHHS AE is to recruit patients for FHHS's home health services.

51.     Consequently, AEs at FHHS and nurse practitioners at FHP, such as Plaintiff-Relator, worked very closely on a regular basis to locate and recruit new patients for FHHS's services. In fact, on one of Plaintiff-Relator's first days, Heidi Shannon ("Shannon"), an FHHS AE who referred several patients to Dr. Marathe even prior to his employment with FHP as a Medical Director, accompanied Plaintiff-Relator on these initial visits to ensure that those patients were certified by FHP and referred to FHHS.

52.     In addition, at least once a month, FHHS AEs and FHP nurse practitioners worked with FHHS's Balance Test Coordinator, Greg Vossler ("Vossler"), to systematically hold "Balance Programs" across Florida to recruit patients. The Balance Programs involve a brief introduction by Vossler and the AE explaining that FHHS's services are entirely free to any senior on Medicare who has diabetes, high blood pressure, has had any new changes in medication, or needs physical therapy. Then, using a laptop computer that is hooked up to a gym-like Bosu ball, Vossler would have a prospective patient stand on the ball while using the support of a rail. Vossler would then have the individuals close their eyes, click some buttons on his computer, and inform them that they were at risk of falls and were recommended for physical therapy. According to Plaintiff-Relator, the test was designed to fail. In fact, even Plaintiff-Relator, a healthy young adult, fell off balance attempting this "test." Only after inevitably

13

failing these balance tests were the senior residents coaxed into signing up for FHHS's services
and then allowed to have the free pizza provided by FHHS.

53.     AEs are further expected to hold a number of other recruitment events per month
known as "Wellness Events" or "Meet-and-Greets" (together with Balance Programs,
collectively, "Patient Recruitment Events"). Wellness Events were events organized by AEs at
senior housing facilities, where FHP physicians and nurse practitioners were required to give
seminars on various health topics and promote FHHS's services. The senior residents are
offered a free pizza lunch, but which they were allowed to eat only *after* registering for FHHS's
services.

54.     FHHS also held events known as "Blitzes," where Matthew Barber ("Barber"),
FHHS's regional manager of the AEs, and the AEs would show up unannounced at different
doctors' offices and housing facilities to introduce FHP nurse practitioners and to begin building
relationships with organizations with the hopes of inducing referrals.

55.     At the respective Patient Recruitment Events and/or Blitzes held by FHHS AEs,
the AEs consistently "jammed" unsuspecting prospective patients with the promise of free
treatment, commonly targeting facilities that housed a large number of senior citizens. These
Patient Recruitment Events were vital to the kickback relationship because rather than have to
request that a prospective patient seek the advice and diagnosis of his/her treating healthcare
provider, FHHS used FHP to act in that capacity, ensuring that the initial encounter would result
in a new patient for both FHHS and FHP. AEs would then immediately send the information to
the FHHS office to be "verified" that he/she is "eligible" for home health services under
Medicare. In practice, however, eligibility for FHHS's services was determined based solely on
the individual's insurance: individuals with health maintenance organization (HMO) plans were

14

automatically denied eligibility, while Medicare recipients were immediately approved for
FHHS services.

56.     After successfully recruiting the patients, FHHS AEs then refer the patients to
FHP to make the required F2F certification and, in turn, FHP would refer that patient back to
FHHS for home health services.

57.     When FHHS sends a patient to FHP, it is the start of a cross-referral scheme. The
patient would not be treated by FHP if it were not for the free marketing of FHHS. FHP can then
bill Medicare or other Government Healthcare Programs for the services of its physicians and
nurses. As directly observed by Plaintiff-Relator, FHHS expects that its referral of a patient to
FHP to result in a referral back to FHHS to provide home healthcare services. Based upon
Plaintiff-Relator's experience, it is difficult (if not impossible) for FHP to refer the patient
elsewhere or suggest an alternate course of action in marginal situations, as FHHS will often
commence home healthcare services for the ailment diagnosed by its AEs at a Patient
Recruitment Event before the patient has even been seen by a physician or nurse practitioner at
FHP.

58.     Indeed, in September 2013, when Plaintiff-Relator stopped referring all of her
clients to FHHS, her employment with FHP was terminated. FHHS's President, Thomas, stated
that the reason for Plaintiff-Relator's termination was because she was not producing enough
referrals and that FHHS AEs were "getting angry" that she was working with other home health
companies. Thomas also stated that Plaintiff-Relator did not have enough "patient encounters"
(*i.e.*, initial visits where Plaintiff-Relator was to make the referral to FHHS). Plaintiff-Relator
responded that many of the referral patients that she received from FHHS were not actually
homebound and, thus, did not qualify for home health services, and that FHHS did not have the

15

requisite staff necessary to adequately provide the services that were actually necessary. Plaintiff-Relator further responded that other home health companies could better meet patient needs because they had staff that included psychiatric nursing and speech therapists, which FHHS purported to but, in reality, did not have. In the end, FHHS/FHP management made it very clear that, if Plaintiff-Relator was not going to send all of her patients to FHHS, then she was no longer able to work for FHP.

59. Through this kickback scheme, Defendants are able to bill the Government under the Government Healthcare Programs for the self-generated medical costs associated with each of these patients passed internally between the two closely-related entities: FHHS for the home health services and FHP for the physician or nurse practitioner visits for certification purposes or other unnecessary medical visits for which FHP can bill under Government Healthcare Programs.

60. As orchestrated by Defendants, FHHS provides free marketing services to recruit patients for FHP with the expectation that such assistance would induce referrals to FHHS for home health services. This free marketing arrangement is the crux of Plaintiff-Relator's kickback allegations and is highly lucrative for FHHS and FHP, to the detriment of the Government Healthcare Programs.

    **ii.  Additional Kickbacks**

61. In addition to the free marketing services provided by the AEs, FHHS also provides FHP with a number of other free (or substantially below fair market value) items and services, as explained below.

62. During Plaintiff-Relator's employment, FHHS provided FHP with rent-free office space for its Jacksonville operations. Indeed, FHP's prescription pads bear the address of

FHHS's Jacksonville office. Upon information and belief, FHHS provides FHP with rent-free office space at other locations across Florida as well. For instance, Plaintiff-Relator's Internal Revenue Service W-2 Form bore an address associated with FHHS's office in Fort Lauderdale.

63. FHHS also provides FHP with equipment and information technology infrastructure that Plaintiff-Relator believes are provided at no cost to FHP. FHP's email system is operated through the FHHS server at www.fhhsfl.com. FHHS and FHP also share servers through which employees could submit requests for and receive reimbursement of expenses, for which Plaintiff-Relator's login name was "dkantor@fhhs.us."

64. FHHS produces all of the FHP marketing materials (*e.g.*, brochures, pamphlets) and sponsors all of the food and drinks at the Wellness Events that result in patient recruitment and referrals to FHP physicians and nurses, as explained above.

65. FHHS also shares its personnel and management with FHP, which Plaintiff-Relator believes is provided at no cost to FHP. For example, Adele Bradley, FHHS's marketer for Jupiter, Florida, also did marketing for FHP's Jacksonville office. Barber, FHHS's regional manager of the AEs, also served as the regional manager for FHP. Dr. Nathan Perry was a medical director for both FHHS and FHP.

66. A review of the management structure of both companies reveals further overlaps: Thomas, serving as the Secretary, Vice President, and President of both FHP and FHHS; and Kevin Ruark, serving as Manager, CEO and CFO of both FHP and FHHS.

67. Upon information and belief, these services and items were provided for free (or at substantially below fair market value) in order to induce FHP to refer Medicare patients to FHHS for home healthcare services.

17

**B.**  **False Certification of Patient Need for Home Health Services**

68.     Defendants' unlawful kickback practices as detailed herein resulted in a

widespread and pervasive scheme to falsely certify patients for home health services in an effort

to artificially maximize Medicare reimbursements at the expense of taxpayers.

69.     It is uncontroverted that FHHS typically hold Patient Recruitment Events in

facilities operated by the U.S. Department of Housing and Urban Development and other

independent living facilities, where there is no oversight as to which vendors and service

providers come into the building.  In fact, FHHS's advertisements for the programs would often

highlight a free meal and would target individuals with diabetes, dizziness, or have difficulty

walking (or an "unsteady gait").  At the events, however, FHHS would recruit *any* low-income

seniors with Medicare or on other Government Healthcare Programs, regardless of any known

medical history and/or diagnosis.

70.     At all of the Patient Recruitment Events, AEs would arrive with a stack of F2F

forms to register individuals for FHHS services.  The F2F forms are the exact forms that the

Medicare statute requires a physician to sign certifying a patient for home health care that can be

reimbursed by Medicare.  Upon information and belief, at least some physicians would sign

blank F2F forms for the AEs to use during the Patient Recruitment Events.

71.     The AEs would fill in the F2F form, based solely on the individuals' reports (or

AE's diagnosis) of diabetes, dizziness, or difficulty walking, with residents' Social Security

numbers, Medicare numbers, and other personal information.  Despite collecting this personal

information, FHHS never provided the individuals with the disclosures or forms required by

Health Insurance Portability and Accountability Act (HIPAA) at these events.

72.     AEs would then immediately send the information to the FHHS office to be "verified" that they were "eligible" for home health services under Medicare or other Government Healthcare Programs.  As previously explained, Medicare and other Government Healthcare Program recipients were immediately enrolled, while all others were rejected for services.

73.     Only after these individuals are already signed up for FHHS's services and already starting to receive the services – *sometimes even on the same day as being signed up at the Patient Recruitment Events* – were the doctors and/or nurse practitioners at FHP then contacted to visit the individual in person to make the required certifications, including the patient's need for the services and the F2F encounters.  Indeed, Plaintiff-Relator was often asked to make the patient visit the day of the "meet and greet."

74.     Defendants did not expect the nurse practitioners or other health providers to take into account the actual, current needs of the individual when certifying the individual for FHHS's services.  Instead, those individuals were signed up immediately for physical therapy or nursing services solely based on an historical diagnosis and were sometimes listed under the wrong practitioner's name.  By way of example, Dr. Rodney Grobes, a podiatrist hired by FHP to provide FHHS access to his established patient base at a HUD facility, would see the patient one time to clip nails or perform routine foot care and sign the patient up for FHHS's services.  Plaintiff-Relator would later make the certification visit for the patient, only to find out that home health services had already been initiated and that Plaintiff-Relator was listed as the provider.

75.     In addition to the certification visits, some FHP physicians and nurse practitioners made a number of other patient visits that were not medically necessary, such as maintaining

unnecessary standing regular visits for patients, but that could be billed to Government

Healthcare Programs.  Some nurse practitioners would bill Medicare or other Government

Healthcare Programs under physician visits when, in actuality, the nurse practitioners were the

ones making the patient visits.

76.     On one occasion, Shannon, an FHHS AE, even asked Plaintiff-Relator to

backdate a form so that an F2F encounter would fit within the statutory deadline of thirty days

from the start of care.  Plaintiff-Relator refused and informed Pat Trimmer ("Trimmer") (the

FHP nursing director), Dr. Marathe, Cobb, and Thomas that she must be the one to order the

services, which cannot be initiated until she determined the need.  While Dr. Marathe agreed

with Plaintiff-Relator and stated that it would be fraudulent under Medicare to initiate services

before a physician's or nurse's visit, Plaintiff-Relator never received responses from Cobb or

Thomas.  Nevertheless, FHHS continued to initiate services prior to Plaintiff-Relator's initial

visits to the patients.

77.     Plaintiff-Relator indicated that many of the referral patients that she received from

FHHS were not actually homebound and, thus, did not qualify for home health services, and that

FHHS did not have the requisite staff necessary to adequately provide the services that were

actually necessary.

78.     Despite the lack of actual need, most FHHS patients were repeatedly recertified to

continue the home health services under Medicare or other Government Healthcare Programs.

Recertification was typically a "verbal order" by a medical director who did not physically

evaluate the patient.  Alternatively, the AEs would first instruct the FHHS office to recertify the

patient for FHHS's services and *then* subsequently request a physician signature.

79.     As a result of Defendants' fraudulent activities as detailed herein, which were undertaken to maximize Government reimbursements for home healthcare services, when FHHS and FHP expressly certified, as a precondition to payment, that they would comply with the terms set out on Form HCFA-1500 (which includes language that the services were "medically indicated and necessary for the health of the patient") and other claims for payment, the claims they submitted were false because many individuals did not qualify for home healthcare services reimbursable under a Government Healthcare Program, nor were such services "reasonable and necessary" for the diagnosis or treatment of such individuals, as explained below.

### i.   Homebound Status

80.     Many patients that were enrolled for FHHS's home healthcare services, for which FHHS then sought Government reimbursement, did not qualify as "homebound," *i.e.*, they were fully ambulatory and capable of driving themselves to appointments.

81.     Patients were signed up for FHHS's services by the AEs at recruitment events, based solely on the AE's self-diagnosis or the patient's verbal report of diabetes or difficulty walking.

82.     Such services were commenced prior to a nurse practitioner or doctor certifying the patient's homebound status.

83.     On multiple occasions, Plaintiff-Relator would make the initial visit and determine that the individuals did not qualify for care because they were not homebound. Nevertheless, AEs would continue to sign the patients up, document that the services were needed, and initiate services, despite Plaintiff-Relator's explicit written explanation of why those patients did not qualify for the services.

84.   For one such patient, referred to as S.A., Plaintiff-Relator was told by the

recruiting AE, Annabelle Manning, that the patient had diabetes and mobility issues.  After

seeing the patient, however, Plaintiff-Relator found that the patient had a history of seizure

disorder and some other chronic issues, but was not homebound.  As a result, Plaintiff-Relator

did not order physical therapy services.  Despite this and without Plaintiff-Relator's knowledge

at the time, Vicki Cox, FHHS's "Wellness Nurse," obtained a verbal order from Dr. Marathe

(who never saw the patient) to initiate home healthcare services for the patient.

ii.    **Need for Services**

85.   In addition to lacking homebound status, many patients also did not need – or

want – the services offered by FHHS.  Nevertheless, FHHS would sign up these patients, begin

furnishing the services, have an FHP doctor or nurse practitioner blindly sign off on the patients'

need, and proceed to seek reimbursement from the Government Healthcare Programs.

86.   On several occasions, Plaintiff-Relator would be asked to visit patients who had

already started care with FHHS to determine patient need for such services.  Even when

Plaintiff-Relator found that the patients did not qualify or require FHHS's services, most patients

continued to receive the care for which FHHS sought Government reimbursement.  Other

patients would be "discharged" with nursing notes indicating the patient had "met or exceeded"

all nursing goals when, in reality, they were never candidates for home health services.

87.   Also, on several occasions, Plaintiff-Relator would make initial home visits to

patients at FHHS's request, but find that the patients were often confused as to why Plaintiff-

Relator was there.  Apparently, when they were initially signed up by FHHS AEs, patients were

never even informed about the nurse practitioner's or doctor's role in certifying the patient for

Medicare-eligible home health services.  Several patients also expressly indicated to Plaintiff-

Relator that they did not want FHHS's services. In some egregious circumstances, patients were already under the care of other home health companies when the AEs signed them up for FHHS's services.

88.     Another Nurse Practitioner, Ed McIntosh ("McIntosh"), had similar experiences and expectations from Defendants to certify patient need for FHHS's medical services. On one occasion when he visited a patient and determined the patient did not qualify for home health services (*i.e.*, patient was not homebound or did not need physical therapy), McIntosh was forced to go back into the Athena Health database (the electronic medical records (EMR) platform used by FHP to document patient "encounters") to change his note to order physical therapy.

89.     FHHS continues to indiscriminately sign up individuals and qualify their eligibility for Medicare coverage or coverage under other Government Healthcare Progarms, despite the individual's lack of need or desire for such services.

### iii.     Plan of Care

90.     42 CFR § 424.22(a) requires a patient to have a plan of care established and signed by his or her physician, pursuant to which the home health services are administered and reimbursed under the Government Healthcare Programs.

91.     Upon information and belief, the plans of care for FHHS's recruited patients were created and signed by Jennifer Sansaverino ("Sansaverino"), the FHHS nurse manager, at the time the patients were recruited and registered for FHHS's home health services. Sansaverino is not a medical doctor, nor did she ever see the patients in person prior to creating their plans of care. In fact, not even physicians from FHP saw the patients prior to the creation of these plans of care. Nurse practitioners, including Plaintiff-Relator, were denied access to patient plans of care.

23

92.     To Plaintiff-Relator's knowledge, plans of care were not signed by Dr. Marathe (or any other FHP Managing Director) prior to the doctor seeing the patient to certify need for services or prior to the patient's start of care and receipt of services from FHHS.

93.     Because the plans of care were created by a non-physician without regard to the patient's needs or conditions, plans of care were based on an AE's initial determination of a generic diagnosis, such as "gait instability" or dizziness, and nursing goals and nursing plans were computer-generated using a program called the Outcome and Assessment Information Set (OASIS). The plans of care were not tailored to the patients; the few plans of care that Plaintiff-Relator accessed by accident did not appropriately reflect the patient for which the plans of care were created. In one instance, after an FHHS nurse "met or exceeded goals" with a patient, N.H., with amyotrophic lateral sclerosis (ALS), Plaintiff-Relator asked the nurse if she had taught N.H. how to care for her feeding tube. The nurse responded that she was not aware that N.H. had a feeding tube. Plaintiff-Relator informed Trimmer of this incident and, after Trimmer informed her that FHHS's role was to provide only education care (which FHHS also failed to do) and not skilled nursing care, Plaintiff-Relator subsequently referred N.H. to another home health care company to provide the skilled care that was needed.

94.     FHHS also maintained an internal policy that capped the frequency of patient visits by FHHS service providers to one or two visits per week. Moreover, Plaintiff-Relator was not permitted to order or make changes to the frequency of service, despite patient need for more than two weekly visits. Plaintiff-Relator was informed by Trimmer that this was because any more visits would not be financially productive for FHHS. This policy, reflected on each patient's plan of care, predictably led to FHHS patients receiving subpar and inadequate care.

95.     Moreover, while plans of care require provision of skilled nursing services and direct patient care to be reimbursable by Medicare, FHHS provides only "education" and not skilled nursing care.  Accordingly, upon information and belief, FHHS misrepresents to the Government when seeking Medicare reimbursement that it provides skilled nursing care when, in reality, FHHS only provides unskilled care such as education training.

### iv.     Under the Care of Physician

96.     As explained herein, due to the method of FHHS's recruitment of and providing services to individuals, it necessarily follows that individuals were not under the care of a physician when they were first recruited as patients for FHHS's services.

97.     Indeed, only after starting care did FHHS then refer FHP physicians to visit the patients, thereby bringing the patients under the care of a physician.  However, there is still a window of time between the start of care and initial visit by an FHP doctor where the patient was not under the care of a physician, as required by federal law governing Medicare reimbursements.

98.     In addition, medical directors were not involved in collaboration with nurse practitioners of FHP, as also required by federal law.  The FHP medical directors were in actuality, utilized solely for signatures to certify patients for Medicare and other Government Healthcare Programs, rather than collaboration with other FHP providers such as Plaintiff-Relator.

### v.     F2F Encounter

99.     Last, the F2F encounters mandated by federal law for Medicare-eligible home health benefits and other, similar Government Healthcare Program benefits performed by FHP personnel, at FHHS's directions, were complete shams.

100.    The F2F forms were filled out by FHHS AEs at the time the patients were recruited and signed up for FHHS's services.  The AEs would use the forms to gather the patient's Medicare or other Government Healthcare Program information, Social Security number, date of birth, and other personal information of the patient.  Additionally, FHHS nurses were instructed on how to complete the F2F forms, including a notation of whether the patient had a doctor or needed one to sign the F2F form.  Patients were never provided with HIPAA forms or privacy papers at the time that their personal information is gathered to fill out the F2F forms and they are signed up for FHHS's services.

101.    Only after the patient begins receiving care from FHHS does FHHS seek FHP doctors to perform the F2F encounters and sign the F2F forms, which are then submitted to the Government to begin claiming payment for home health services under Government Healthcare Programs.  In some egregious cases, patients were already under the care of outside medical providers, yet FHHS would instruct Plaintiff-Relator to see the patient and bypass the certification process.

102.    Despite objectively failing to qualify for Medicare or other Government Healthcare Program home health benefits, FHHS and FHP would certify the individuals as needing FHHS's services and begin the home healthcare services anyway.  Accordingly, because FHP certified individuals as eligible for Medicare or other Government Healthcare Program services when they actually were not eligible, FHHS made false claims for payment to the Government.

### vi.    Unnecessary or Inadequate Patient Care

103.    As a natural result of FHHS's focus on maximizing profits in seeking reimbursement from the Government for home health services, many patients received and continue to receive unnecessary care, as described above.  Not only do the services provided to

the patients fail to meet the statutory standards for reimbursement, but the services provided are

not medically necessary, as determined by nurse practitioners like Plaintiff-Relator.

104.    Meanwhile, other patients were receiving inadequate care from FHHS as a result

of internal policy decisions (e.g., the "twice per week visit" policy) and deficient staffing and

capacity to provide the services required for all of the patients recruited. In one instance,

Plaintiff-Relator saw a patient, J.H., who was blind, diabetic, and on dialysis. J.H. was told by

FHHS that a nurse would come and she waited for weeks for the promised visit, which never

came. Plaintiff-Relator also requested a social worker from FHHS to see J.H., but one was never

provided. Finally, Plaintiff-Relator was forced to order another home health agency to replace

FHHS because FHHS had failed to provide the necessary services to J.H.

105.    Another patient, M.S., was in need of wound care for a diabetic ulcer and the

nurse who was allegedly on service for that 60-day period had not been visiting. M.S. was then

recertified for 60 additional days and still did not receive the care he needed from FHHS. M.S.

was later noted to have a larger wound and significant weight loss, and required hospitalization

and rehabilitation services for proper care.

106.    Because plans of care were created by administrative staff and not tailored to each

patient, they provided for both unnecessary and inadequate health care regiments for FHHS's

patients. For some, the plans would order services where physical therapists would be make

short visits and have patients use a foot pedaling machine, regardless of suitability to the

patient's health conditions (e.g., the patient had knee surgery or a cardiac disease). For others,

the plans limited visits to once or twice a week for patients who required more care and more

frequent visits. For most, patients were discharged early regardless of their actual medical needs,

as the home health flat fee reimbursement request had already been submitted to Medicare and

FHHS did not have sufficient staff to actually provide the required services.

## VIII.   CONCLUSION

107.   The decision-making of the physician, a critical element in Government

Healthcare Program coverage policy, was completely undermined by the unlawful patient

recruitment, referral, and administration of home healthcare practices of Defendants.  The FHP

physicians referring patients to FHHS for home health services did not necessarily do so because

they believed, based on their F2F encounters and determination of the patients' needs, that the

home healthcare services would help their patients; rather, the physicians only signed off on the

false certifications (after services have already begun) required to begin FHHS's eligibility for

reimbursement from Government Healthcare Programs because the physicians were actively

pursued and enticed by FHHS with kickbacks.

## COUNT I – FCA

108.   Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as

though fully set forth herein.

109.   This is a claim by Plaintiff-Relator, on behalf of the United States, for treble

damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against Defendants, for

knowingly causing to be presented false claims to Government Healthcare Programs.  From as

early as 2006 through the present in the Middle District of Florida and elsewhere throughout the

United States, Defendants have knowingly and willfully violated the FCA by submitting and

causing false claims to be submitted.

110.   Defendants have knowingly submitted false claims to federal and state

Government Healthcare Programs for reimbursement, knowing that such Government Healthcare

Programs were unaware that they were reimbursing for home healthcare services induced by kickbacks and/or for services that were not medically reasonable or necessary and were, therefore, false claims. By virtue of the acts alleged herein, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A)-(B).

111.    Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by causing the State of Florida to submit false claims to the Government on Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which falsely certified that all home healthcare services for which federal reimbursement was sought were paid for in compliance with federal law, including the AKA and requirements for home health benefits.

112.    Defendants caused false claims to be submitted, resulting in Government Healthcare Program reimbursement to healthcare providers in the millions of dollars, in violation of the FCA, 31 U.S.C. § 3729, *et seq.* and the AKA, 42 U.S.C. § 1320a-7b(b)(2)(A).

113.    The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim presented or caused to be presented.

WHEREFORE, Plaintiff-Relator respectfully requests this Court enter judgment against Defendants as follows:

      (a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the FCA, 31 U.S.C. § 3729, *et seq.*, provides;

      (b)    That civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the Government Healthcare Programs under the FCA;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Plaintiff-Relator necessarily incurred in bringing and prosecuting this case;

(d)     That Plaintiff-Relator be awarded the maximum amount allowed pursuant to the FCA; and

(e)     That the Court award such other and further relief as it deems proper.

## COUNT II – FLORIDA FALSE CLAIMS ACT

114.    Plaintiff-Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

115.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

116.    Fla. Stat. § 68.082(2) provides liability for any person who

(a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency; or

(c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

117.    Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

118.    Defendant violated Fla. Stat. § 409.920(c) and (e) and §456.054(2) by engaging in the conduct alleged herein.

119.    Defendant further violated Fla. Stat. § 68.082(2) and knowingly caused thousands

of false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FDCA, federal AKA, Fla. Stat. § 409.920(c) and (e) and §456.054(2) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Healthcare Programs.

120.    The State of Florida, by and through state-funded Government Healthcare Programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

121.    Compliance with applicable Medicare and the various other federal and state laws cited herein was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with applicable Florida statutes, regulations, and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Florida.

122.    Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

123.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

124.    Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of herself and the State of Florida.

31

125.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Florida in the operation of its Government Healthcare Programs.

WHEREFORE, Plaintiff-Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF FLORIDA:

(1)     Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Florida;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Plaintiff-Relator:

(1)     The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Plaintiff-Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator demands a trial by jury on all Counts.

Dated: March 6, 2015                    Respectfully submitted,

                                        SHEPHERD, FINKELMAN, MILLER & SHAH,
                                        LLP


                                         /s/ Nathan C. Zipperian
                                        Nathan C. Zipperian
                                        Shepherd, Finkelman, Miller & Shah, LLP
                                        1640 Town Center Circle, Suite 216
                                        Weston, FL 33326
                                        Tel: (954) 515-0123
                                        Fax: (866) 300-7367
                                        nzipperian@sfmslaw.com

                                        James E. Miller
                                        Laurie Rubinow
                                        Shepherd, Finkelman, Miller & Shah, LLP
                                        65 Main Street
                                        Chester, CT 06412
                                        Tel: (860) 526-1100
                                        Fax: (866) 300-7367
                                        jmiller@sfmslaw.com
                                        lrubinow@sfmslaw.com

                                        Rose F. Luzon
                                        Valerie L. Chang
                                        Shepherd, Finkelman, Miller & Shah, LLP
                                        401 West 'A' Street, Suite 2350
                                        San Diego, CA 92101
                                        Tel: (619) 235-2416
                                        Fax: (866) 300-7367
                                        rluzon@sfmslaw.com
                                        vchang@sfmslaw.com

                                        Eric L. Young
                                        Brandon J. Lauria
                                        McEldrew Young, Attorneys-at-Law
                                        123 South Broad Street, Suite 2250
                                        Philadelphia, PA 19109
                                        Tel: (215) 367-5151
                                        Fax: (215) 367-5143
                                        eyoung@mceldrewyoung.com
                                        blauria@mceldrewyoung.com

                                        *Attorneys for Plaintiff-Relator*

33

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served pursuant to Rule 4 of the

Federal Rules of Civil Procedure and the United States False Claims Act, as follows:

### Via Certified Mail, Return Receipt Requested

Eric C. Holder, Jr.
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001
**Attn: False Claims Act Filing**


Jason Mehta
U.S. Attorney's Office
U.S. Department of Justice
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202


Dated: March 6, 2015               /s/ Nathan C. Zipperian
                                   Nathan C. Zipperian
                                   Shepherd, Finkelman, Miller & Shah, LLP
                                   1640 Town Center Circle, Suite 216
                                   Weston, FL 33326
                                   Tel: (954) 515-0123
                                   Fax: (866) 300-7367